42 N.J. 389 (1964)
201 A.2d 46
JOSEPH BLUM, PLAINTIFF-APPELLANT,
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS, AFL-CIO, AND CHARLES E. BEYER AND WARREN O. HOFFMAN, INDIVIDUALLY AND AS MEMBERS OF THE "I.A.M. COMMITTEE AT OXWALL PRODUCTS," DEFENDANTS-RESPONDENTS.
The Supreme Court of New Jersey.
Argued March 3, 1964.
Decided June 1, 1964.
*391 Mr. Wilbur M. Rush argued the cause for the appellant (Mr. Robert L. Schumann, on the brief).
Mr. Thomas L. Parsonnet argued the cause for the respondents (Messrs. Parsonnet & Parsonnet, attorneys).
The opinion of the court was delivered by JACOBS, J.
The Appellate Division directed that summary judgment against the plaintiff be entered on the ground that jurisdiction had been preempted by the National Labor Relations Act and the Labor Management Relations Act as amended. 80 N.J. Super. 37 (1963). We granted certification on the plaintiff's application. 41 N.J. 196 (1963).
The plaintiff was plant manager and an executive officer of Oxwall Products Company which was engaged in interstate commerce and conducted assembly and shipping operations at its premises in Oxford, New Jersey. In November 1960 the respondent union began a campaign to organize Oxwall's workers and its efforts met with active resistance from the employer acting through its plant manager. There were accusations and cross-accusations which were followed by the issuance on May 26, 1961 of an unfair labor practice complaint against the employer and the filing on July 6, 1961 of a common law libel action against the union. Hearings on the unfair labor practice complaint were held before a trial examiner of the National Labor Relations Board. Testimony was taken with respect to the union's organizational activities, *392 including its distribution of weekly or semi-weekly leaflets at Oxwall's plant gate, and with respect to the activities of the employer which were aimed towards avoiding the unionization of its employees.
The trial examiner found that the employer had interfered with, restrained or coerced employees in the exercise of the rights guaranteed by § 7 of the National Labor Relations Act, and had thereby violated § 8(a)(1) by interrogating employees concerning their union activities and by threatening employees with reprisals because of union activities. The examiner found further that the employer had discriminatorily discharged certain named employees and had thereby engaged in unfair labor practices within the meaning of §§ 8(a)(1) and (3), and he recommended the form of relief including a cease and desist order and the payment of wages lost by the employees who suffered the discriminatory discharges. The Board agreed with its examiner's findings and recommendations and entered an appropriate order (Ox-Wall Products Mfg. Co., 135 N.L.R.B. 840 (1962)); a petition to set aside the order was denied and enforcement was directed in Oxwall Tool Co. v. National Labor Relations Board, 310 F.2d 878 (2 Cir. 1962).
The plaintiff's libel action seeks compensatory and punitive damages because of statements made by the union representatives during the organizational campaign. These statements were contained in sheets or leaflets which were known as "Union News" and were distributed periodically to the employees. A January 1, 1961 issue of the Union News allegedly contained the following: "Why the concentration camp pressure by `Joe' and his pet stooges" ... "Could it be that `Joe' fears the facts that Oxwall workers are about to free themselves of the company Gestapo tactics" ... "As `Joe' rides again and again through the shop spreading fear * * *." An April 4, 1961 issue allegedly stated that "Joe is using the `Big lie' tactics of Hitler and the fear and threats like Russian pressures to dictate your future"; a June 8, 1961 issue allegedly contained the following: "Joe Blum and other *393 Company officials have discriminated, intimidated, bribed and coerced Oxwall workers in order to prevent a free choice of Secret Ballot Vote for a Union of their choosing"; and a March 2, 1962 issue allegedly charged that "Joe Blum & Company have used bribery, threats and favoritism to influence you." In its answer the union set up the defenses of truth, privileged communication and fair comment. See Prosser, Torts § 95 (2d ed. 1955). In an amendment of the answer the defendant set forth the following:
"The issues herein involved concern a labor dispute between a labor organization and an employer, in which the plaintiff is a managing executive and which employer is engaged in interstate commerce under the terms of the Federal Labor-Management Relations Act as amended. The acts complained of in the Complaint and its Amendments are part and parcel of that labor dispute and the entire action is, by reason of the aforesaid Act of Congress, preempted to the proper federal jurisdiction and authority. Such preemption is exclusive and therefore this Court has no jurisdiction in this cause at all."
Thereafter the plaintiff moved to strike the defense of preemption. His motion was granted by the trial court and, with leave, the union appealed to the Appellate Division. There the trial court's action was reversed in an opinion by Judge Goldmann which, after discussing the pertinent federal cases dealing with preemption in the labor relations field, expressed the firm view that the plaintiff's libel action was "arguably subject to § 7 or § 8 of the federal act" and was therefore preempted under the principles expressed in San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); the opinion stressed the freedom of expression provision in § 8(c) and determined that statements, such as those allegedly made here by the union during an organizational campaign having in ultimate view an election under § 9(c) could not, consistently with the policies underlying the federal legislation, be the proper subject of a state court libel action seeking compensatory and punitive damages. Such reported cases as are at all comparable have reached a similar result. See Hill v. Moe, 367 *394 P.2d 739 (Alaska 1961), cert. denied 370 U.S. 916, 82 S.Ct. 1554, 8 L.Ed.2d 498 (1962); Schnell Tool & Die Corp. v. United Steelworkers, 200 N.E.2d 727 (Ohio Com. Pl. 1964); cf. Kominski v. Western Express Co., 37 Misc.2d 992, 234 N.Y.S.2d 976 (Sup. Ct. 1962), aff'd 19 A.D.2d 862, 245 N.Y.S.2d 372 (1963).
In Garner v. Teamsters, C. & H. Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), preemption in the labor field emerged in full bloom. The teamsters union had been able to recruit only a handful of employees though the employer had not objected to unionization. Nevertheless the union began picketing and the employer obtained a lower state court injunction based on the fact that the picketing violated Pennsylvania's Labor Relations Act. The injunction was set aside by the Pennsylvania Supreme Court on the ground that the federal remedy was exclusive and its judgment was sustained by the United States Supreme Court. In the course of his opinion for the Court, Justice Jackson declined to consider whether the picketing violated the federal legislation, noting that the power and duty of primary decision rested with the National Labor Relations Board. He pointed out that Congress had not only laid down the substantive rules of law but had provided for centralized administration and that a "multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law." 346 U.S., at p. 491, 74 S.Ct., at p. 166, 98 L.Ed., at p. 241. He rejected the employer's contention that the federal legislation was designed to enforce only a public right whereas the state court's power was invoked to protect only a private right and then said:
"Further, even if we were to assume, with petitioners, that distinctly private rights were enforced by the state authorities, it does not follow that the state and federal authorities may supplement each other in cases of this type. The conflict lies in remedies, not rights. The same picketing may injure both public and private rights. But *395 when two separate remedies are brought to bear on the same activity, a conflict is imminent." 346 U.S., at pp. 498-499, 74 S.Ct., at p. 170, 98 L.Ed., at pp. 243-244
The Court's opinion in Garner recognized that there may be certain exceptions to its broad rule of preemption; it cited Allen-Bradley Local, etc. v. Wisconsin E. Rel. Bd., 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1945), which involved mass picketing and threats of physical violence, and International Union UAW v. Wisconsin Empl. Rel. Bd., 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949), which involved intermittent and unannounced work stoppages. In United Constr. W., etc. v. Laburnum Constr. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), the union threatened a contracting company with violence to such a degree that it was obliged to abandon its work. The company sued in a state court for compensatory and punitive damages and obtained a judgment. The union contended that the National Labor Relations Act had deprived the state court of jurisdiction but its position was rejected by the Supreme Court in an opinion by Justice Burton which stressed the fact that the Board had no power to grant relief comparable to that available in the state court action. In their dissent, Justices Douglas and Black noted that the union's conduct amounted to an unfair labor practice and they took the position that the Board's jurisdiction should be deemed exclusive; they expressed the thought that if the parties to the labor controversy have, not only the remedy provided by Congress, but also a common law action for damages, then the controversy is not settled by what the federal agency does but "drags on and on in the courts, keeping old wounds open, and robbing the administrative remedy of the healing effects it was intended to have." 347 U.S., at p. 671, 74 S.Ct., at p. 841, 98 L.Ed., at p. 1035. See also International Union, U.A.A., & A.I.W. v. Russell, 356 U.S. 634, 647, 78 S.Ct. 932, 2 L.Ed.2d 1030, 1040 (1958) (dissent of Warren, C.J. and Douglas, J.). In Weber v. Anheuser-Busch, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955), the Court declined to extend Laburnum to a nonviolence *396 case where a state court had issued an injunction restraining union conduct which violated the state's common and statutory law (criminal as well as civil) dealing with restraints of trade; the Supreme Court, through Justice Frankfurter, held that exclusive jurisdiction was in the Board.
In International Asso. Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958), a union member who had been wrongfully expelled from his union brought a state court action for reinstatement and damages. He obtained a judgment ordering reinstatement and awarding damages for lost wages as well as physical and mental suffering. The Supreme Court, through Justice Frankfurter, held that the state court had jurisdiction to entertain the action even though it be assumed that the union's action constituted an unfair labor practice under § 8(b)(2). The majority opinion stressed that federal law had not undertaken to protect union members from arbitrary union conduct and that the Board could not grant relief as extensive as that available in the state court. In their dissent, Chief Justice Warren and Justice Douglas relied heavily on Garner, noting that the broad preemption holding there had never been impaired "[w]ith the exception of cases allowing the state to exercise its police power to punish or prevent violence." 356 U.S., at p. 625, 78 S.Ct., at p. 927, 2 L.Ed.2d, at p. 1024. They urged that when Congress provided a certain measure of relief through Board proceedings, "it created all the relief it thought necessary to accomplish its purpose" and that any additional redress under state law for the same conduct "cannot avoid disturbing this delicate balance of rights and remedies." 356 U.S., at p. 628, 78 S.Ct., at p. 929, 2 L.Ed.2d, at p. 1026.
In San Diego Bldg. Trades Council v. Garmon, supra, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775, the Supreme Court undertook to clarify and conform the earlier preemption cases. The union had sought an agreement that the employer would retain only union members or those who applied for membership within 30 days. The employer refused and the union *397 began picketing and exerting pressure on the employer's customers and suppliers. A suit was instituted in the state court for an injunction and damages and a representation proceeding was started before the National Labor Relations Board. The Board declined jurisdiction and the state court granted both injunctive relief and damages. The United States Supreme Court first determined that the Board's refusal to assert jurisdiction did not leave the state with power over activities it would otherwise be preempted from regulating. See 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (1957); Guss v. Utah L.R.B., 353 U.S. 1, 77 S.Ct. 598, 609, 1 L.Ed.2d 601 (1957). It then held that the state was preempted from regulating the activities in question and that it could grant neither an injunction nor damages; in the course of its opinion the Court formulated the now familiar rule that "when an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." 359 U.S., at p. 245, 79 S.Ct., at p. 780, 3 L.Ed.2d, at p. 783.
In his opinion in Garmon, Justice Frankfurter reaffirmed the breadth of Garner and dealt with Laburnum and Gonzales as exceptional. Gonzales was described as a case where the activity regulated was "a merely peripheral concern of the Labor Management Relations Act." 359 U.S., at 244, 79 S.Ct., at p. 779, 3 L.Ed.2d, at p. 782. And Laburnum was described as a case where the activity was marked by "violence and imminent threats to the public order" and where state jurisdiction was permitted to prevail because the compelling state interest "in the maintenance of domestic peace" was not overridden by any clearly expressed congressional direction. 359 U.S., at p. 247, 79 S.Ct. 773, 781, 3 L.Ed.2d, at p. 784. In response to the suggestion that since the Board may restrain but may not grant damages, state court action awarding damages alone should not be preempted, the Court said:
*398 "Nor is it significant that California asserted its power to give damages rather than to enjoin what the Board may restrain though it could not compensate. Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme. See Garner v. Teamsters, etc. [C. & H. Local] Union, 346 U.S. 485, 492-497, 74 S.Ct. 161, 166-169, 98 L.Ed. 228 [240-243]. It may be that an award of damages in a particular situation will not, in fact, conflict with the active assertion of federal authority. The same may be true of the incidence of a particular state injunction. To sanction either involves a conflict with federal policy in that it involves allowing two lawmaking sources to govern. In fact, since remedies form an ingredient of any integrated scheme of regulation, to allow the State to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict." 359 U.S., at pp. 246-247, 79 S.Ct., at p. 780, 3 L.Ed.2d, at p. 784
Since Garmon, its principles have been consistently applied to preclude state courts from entertaining tort actions for activities arguably subject to the protections of § 7 or the prohibitions of § 8 of the National Labor Relations Act. Thus in Local 100 of United Association of Journeymen v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963), it was held that a state court could not exercise jurisdiction in a tort action seeking damages for malicious interference by the union with the plaintiff's right to pursue a lawful occupation. The union's business agent had wrongfully refused to refer the plaintiff to a particular job for which he had been sought and for which he was qualified under union rules. The Supreme Court found that since it was reasonably arguable that the matter came within the Board's jurisdiction, the state court was precluded. 373 U.S., at pp. 693-696, 83 S.Ct. 1423, 10 L.Ed.2d, at pp. 642-643. In Local No. 207, Intern. Ass'n of Bridge, Structural & Ornamental Iron Workers Union v. Perko, 373 U.S. 701, 83 *399 S.Ct. 1429, 10 L.Ed.2d 646 (1963), a union member instituted a state court action seeking damages for a conspiracy to deprive him of the right to continue work as a foreman. The Supreme Court held that the action was preempted since the Board arguably had jurisdiction though it could not grant damages of the type sought by the plaintiff. See Smith v. Pittsburgh Gage & Supply Co., 412 Pa. 171, 194 A.2d 181 (1963). In Retail Clerks, etc. v. Schermerhorn, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963), the Court held that in view of the terms of § 14(b) a state court could entertain an action seeking to enforce the state's prohibition against an agency shop clause in a collective bargaining agreement. As the Court's opinion discloses, this case does not in anywise impair the current effectiveness of the preemption principles set forth in Garmon (see also Liner v. Jafco, 375 U.S. 301, 306-308, 84 S.Ct. 391, 11 L.Ed.2d 347, 351 (1964)) but merely illustrates that where, in a given situation, the congressional purpose not to preempt appears, it will be given effect. See Smith v. Evening News Asso., 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); cf. In re Application of Waterfront Comm. of N.Y. Harbor, 35 N.J. 62, 68, appeal dismissed 368 U.S. 32, 82 S.Ct. 146, 7 L.Ed.2d 91 (1961).
Clearly, the case at hand does not come within any of the stated exceptions to Garmon. There is no suggestion of violence or threat of violence as in Laburnum, there is no pertinent statutory provision indicating intent not to preempt as in Schermerhorn, and the activity is not of peripheral concern as in Gonzales, even assuming that case to have survived Borden and Perko. On the contrary, the activity here, in the language of Garmon, was within one of the "areas of conduct which must be free from state regulation if national policy is to be left unhampered." 359 U.S., at p. 246, 79 S.Ct., at p. 780, 3 L.Ed.2d, at p. 784. The union was engaged in organizational activity and the employer, acting through the plaintiff, was resisting unionization. The employer was a close family corporation and the plaintiff was a member of the *400 family and the plant manager. In the present context no differentiation may fairly be drawn between him and the employer corporation. See § 2(2) (29 U.S.C.A. § 152(2)).
In resisting unionization the employer engaged in various activities including threats of reprisals and discriminatory discharges which were later found by the Board to constitute interference with the rights guaranteed by § 7 in violation of the prohibitions of § 8. Within the protection of § 7, the union had the right to distribute, as it did, leaflets at the plant gate seeking to persuade employees to join the union and the statements in the leaflets were apparently directed defensively towards counteracting the employer's activities including the improper threats of reprisals. Whether its statements came within the intended protection of the freedom of expression provisions of § 8(c) or whether its statements in the light of the totality of the conduct constituted an unfair labor practice would be matters for the Board to determine in the first instance. Under any considered view, the union's activities were "arguably subject to § 7 or § 8 of the Act" within the contemplation of Garmon and, that being so, the matter was one for the Board's determination rather than for a state court's determination in a libel proceeding.
The Board may not have power to grant private damages comparable to those available in the state court proceeding but that was so in Garmon, Borden and Perko and is not significant. Indeed, as was pointed out in Garmon, allowance of a remedy withheld by Congress from the National Labor Relations Board "only accentuates the danger of conflict." 359 U.S., at p. 247, 79 S.Ct., at p. 781, 3 L.Ed.2d, at p. 784. When Congress established its comprehensive field of federal regulation, it contemplated that its agency would have and exercise broad powers designed to aid in achieving expeditious and peaceful determinations of industrial disputes. Its legislation is intended to protect the freedom of employees to unionize or not and to encourage rather than discourage the free flow of information and propaganda to the employees. See §§ 1, 7, 8(c); NLRB v. Drivers, etc., *401 Local Union, 362 U.S. 274, 279, 80 S.Ct. 706, 4 L.Ed.2d 710, 715 (1960). State court libel actions, and indeed their very threat, might well unduly restrict such free flow and might well unduly retard, as here, the important goal of achieving early settlements of industrial conflicts. As Chief Justice Warren and Justice Douglas pointed out in their Gonzales dissent, the allowance of any remedy beyond those provided by Congress disturbs the delicate balance of rights and remedies, and this is particularly true where the remedy may include punitive damages fixed by a jury in response "to those `local procedures and attitudes toward labor controversies' from which the Garner Case sought to isolate national labor regulation." 356 U.S., at p. 628, 78 S.Ct., at p. 929, 2 L.Ed.2d, at p. 1026. See also San Diego Bldg. Trades Council v. Garmon, supra, 359 U.S., at pp. 246-248, 79 S.Ct., at p. 773, 3 L.Ed.2d, at pp. 784-785; cf. Local 100 of United Association of Journeymen v. Borden, supra, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638; Local No. 207, Intern. Ass'n of Bridge, Structural & Ornamental Iron Workers Union v. Perko, supra, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646; Liner v. Jafco, supra, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347.
California Dump Truck Owners Ass'n v. Teamsters, Local 42, 45 CCH Lab. Cas., par. 50,546 (Cal. Super. Ct. 1962), is the only case cited by the plaintiff where the court rejected a unions defense of preemption in a libel action. But that case did not involve any statements made during an organizational campaign having in ultimate view an election under § 9(c). The California court readily distinguished Garmon by pointing out that nothing in the holding there divested state courts of "their traditional jurisdiction over tort actions not related to a labor dispute"; such actions do not, of course, involve situations arguably within the jurisdiction of the National Labor Relations Board.
In the case at hand, however, the alleged defamatory statements were part and parcel of a labor dispute which produced related charges and countercharges during the union's efforts *402 towards unionization and the employer's resistance. Allegations of defamatory statements during such industrial disputes have come frequently within the Board's jurisdiction in the course of unfair labor practice hearings under § 8 as well as in certification proceedings under § 9 (c). See Des Moines, Springfield & Southern Route, 78 N.L.R.B. 1215, 1218 (1948); Morristown Knitting Mills, Inc., 86 N.L.R.B. 342, 349 (1949), vacated by consent 20 CCH Lab. Cas., par. 66,593 (6 Cir. 1951); Electronics Equipment Co., Inc., 94 N.L.R.B. 62 (1951), enforcement denied 194 F.2d 650 (2 Cir. 1952); Globe Wireless Ltd., 88 N.L.R.B. 1262, 1263 (1950), enforced 193 F.2d 748 (9 Cir. 1951); F.H. Snow Canning Co., 119 N.L.R.B. 714, 715 (1957); Continental Motors, Inc., 145 N.L.R.B. No. 107 (1964); cf. N.L.R.B. v. Illinois Tool Works, 153 F.2d 811 (7 Cir. 1946); Maryland Drydock Co. v. N.L.R.B., 183 F.2d 538 (4 Cir. 1950).
Section 8(c) provides that the "expressing of any views, argument, or opinion, or the dissemination thereof" shall not constitute or be evidence of an unfair labor practice if the expression contains "no threat of reprisal or force or promise of benefit" (29 U.S.C.A. § 158(c)). The Board has been called upon from time to time in unfair labor practice cases to exercise its primary jurisdiction and determine whether alleged defamatory expressions, used by either the union or the employer, came within the protection of the broad terms of § 8(c). See, e.g., Central Massachusetts Joint Board, 123 N.L.R.B. 590, 603-604 (1959). Similarly, in certification proceedings under § 9(c) it has been called upon from time to time to deal with § 8(c) and determine whether statements made, as here, during an organizational campaign having an election in view, went too far and impaired the employees' freedom of choice. See, e.g., Dal-Tex Optical Company, Inc., 137 N.L.R.B. 1782, 1787 (1962); Christensen, "Free Speech, Propaganda and the National Labor Relations Act," 38 N.Y.U.L. Rev. 243, 259-263, 274-279 (1963).
In Gummed Products Co., 112 N.L.R.B. 1092 (1955), the Board set aside an election because of deliberately false *403 statements by the union; in the course of its opinion it noted that ordinarily name-calling and falsehoods, while not condoned, may be excused so long as they are not so misleading as to "prevent the exercise of a free choice by employees in the election of their bargaining representatives." In Sewell Manufacturing Co., 138 N.L.R.B. 66 (1962), the Board set aside an election where the employer had issued statements appealing to racial prejudice and suggesting that the employees should not affiliate with organizations that demand "racial integration, socialistic legislation, and free range of communist conspirators." The Board's opinion pointed out that it sought to provide a suitable laboratory for determining the desires of the employees and that when the standard falls too low the election would be set aside; that unsatisfactory conditions for holding the election may be created by deliberate misrepresentation by the employer, or the union, or by a general atmosphere of fear; and that so long as a party limits itself "to truthfully setting forth another party's position on matters of racial interest" and does not deliberately seek to overstress racial feeling by irrelevant appeals, an election should not be set aside on that ground. 138 N.L.R.B., at pp. 69-72. See N.L.R.B. v. Trancoa Chemical Corporation, 303 F.2d 456, 461-462 (1 Cir. 1962).
The foregoing illustrates the wide measure of control and the wide power of restraint exercised by the Board and also suggests the real danger of conflict if state actions for alleged defamatory statements made during organizational campaigns having elections in view, are permitted. Thus the Board might find the statements to be truthful and within permissible standards whereas, in the language of the Appellate Division, "a local jury might find just the opposite." 80 N.J. Super., at p. 49. It must be borne in mind that we are concerned here with basic national labor policies which should not be endangered. See Local 20, Teamsters, Chauffeurs and Helpers Union, etc. v. Morton, 84 S.Ct. 1253 (1964). Employees must be afforded informed opportunity to choose and unions must be afforded fair opportunity to *404 inform and persuade. Here the union was peacefully seeking to inform and persuade and any language excesses on its part must be considered in the industrial setting and in the light of the unfair labor practices engaged in by the employer in the course of its resistance to unionization. The threat, beyond Board control and discipline, of state litigation with its exposure to punitive damages, may unnecessarily tend to deprive employees of the fullness of information and debate which is properly part of the scene. In any event, congressional purpose is the determinant and although Congress has provided for private remedies in other given situations, it has never provided for the private remedy here; indeed, the very lengths to which it has gone in affording broad authority in the Board to deal with statements made during organizational campaigns having elections in view, evidence the congressional purpose to preempt. Cf. Weber v. Anheuser-Busch, supra, 348 U.S., at p. 481, 75 S.Ct., at p. 480, 99 L.Ed., at p. 558; Ratner, "New Developments in Federal-State Jurisdiction," N.Y.U. 15th Conf. on Labor 47 (1962). The principles expressed in Garmon and applied in Borden and Perko were most recently reasserted in their full sweep by the Supreme Court in Liner v. Jafco, supra, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347, 351 (1964) and Hattiesburg Bldg. & Trades Council v. Broome, 376 U.S. 902, 84 S.Ct. 1156, 12 L.Ed.2d 172 (1964). See also Local 20, Teamsters, Chauffeurs and Helpers Union, etc. v. Morton, supra, 84 S.Ct. 1253. They are, of course, controlling upon us and their proper application dictates the result reached by the Appellate Division.
Affirmed.
FRANCIS, J. (dissenting).
Libel is a crime at common law. It became such primarily because of its potentiality for incitement to violence and consequent breach of the peace. The criminality was found in the utterance of scurrilous "fighting words," which experience had shown were likely to provoke an immediate breach of the peace. It was found also, as a *405 secondary factor, in the great capacity libel has for harm to the reputation of the victim. 1 Odgers, Libel and Slander (2d Eng. ed. 1887), p. 6; 2 Wharton, Criminal Law and Procedure, § 883, p. 749 (1957); Annotation, 19 A.L.R. 1470 (1922); and see, Beauharnais v. Illinois, 343 U.S. 250, 254-257, 72 S.Ct. 725, 96 L.Ed. 919 (1952).
Violence came to be regarded as such a likely emanation of libel or slander that for reasons of deterrence the law adopted the principle that mere words, written or spoken, no matter how opprobrious, would not be accepted as a defense to assault and battery or manslaughter provoked by them.
Against this background the majority opinion creates an anomaly. If when Blum read the libel he looked out the window of his employer's plant and saw the writer of the leaflets in a picket line, and in anger went outside and physically assaulted him, the injured man could bring a suit for damages in the state court. But, since under the view of the majority, Blum's common law action for libel has not only been withdrawn from the state scene, but all right to monetary damages wiped out as well, he could not file a counterclaim in the assault action. That result ignores a fact of life. Ecchymosis of the eye is usually ephemeral; libel frequently scars a reputation forever. The bard whose 400th anniversary we are engaged in celebrating, expressed the age-old view:
"* * * He that filches from me my good name, Robs me of that which not enriches him, And makes me poor indeed."
A don't-do-it-again order from the National Labor Relations Board, or a directive to the libeler to post a notice of retraction somewhere, neither deters the wrongdoer nor compensates the victim nor repairs the hurt he suffered.
The opinion of the majority poses another problem. If state court damage actions for libel are preempted because of the possibility that they will disrupt or interfere with national policy in the labor relations field, does it follow that the *406 state's power to indict for criminal libel has been superseded also? If the prosecution is not preempted, surely indictment resulting from a criminal complaint of the libeled person, or even the filing of the complaint, would have at least as much effect on the collective bargaining process as the damage action.
Even though the criminal process is not resorted to very frequently in these modern days as punishment for libel, I have referred to the penal aspect because human nature has not changed very much and the capacity of defamatory writings to incite to violence remains with us. Therefore, I believe that if damage actions based on violence on the part of an employer or union are not considered withdrawn from the jurisdictional competence of the state courts, such actions based on libelous utterances on the part of either group, the tendency of which is to trigger violence, ought to be left to the state sovereignty as well. I can see nothing in the language of the Labor Management Relations Act which preempts the one and leaves us the other.
Experience seems to have demonstrated that continuance of jurisdiction in the state courts over civil and criminal matters arising from violence in labor relations has proved a steadying influence on both management and labor in the solution of their disputes. No substantial evidence suggests the national labor policy has been prejudicially affected by the absence of preemption. Similar state control in controversies over libelous statements undoubtedly will be productive of a like mutual and healthy restraint.
The common law right of an individual to redress for libel, whether he be an employee in the management echelon or a union-member employee or union organizer, ought not to be regarded as removed from the jurisdiction of the state courts by the Labor Management Relations Act unless the Congressional intent or direction to do so is clear. In the absence of an express or plainly implied intention appearing therein to occupy the area exclusively, we should regard it as the duty of our Court to assert the state's jurisdiction. Since no such *407 clear expression to that end is to be found in the act, and since the precise question has not been authoritatively settled in the federal domain, in my judgment we should retain this libel action in the Law Division.
We cannot concern ourselves at this stage of the proceeding with the question whether the statements set out in the leaflets are libelous. Their defamatory character had to be assumed conclusively for purposes of the summary judgment motion and we must hold to that assumption in order to deal with the only problem to be decided, i.e., the preemption problem.
For the reasons stated, I vote to reverse the judgment of the Appellate Division and to reinstate the order of the trial court striking the defense of preemption.
Justices SCHETTINO and HANEMAN join in this dissent.
For affirmance  Chief Justice WEINTRAUB, and Justices JACOBS, PROCTOR and HALL  4.
For reversal  Justices FRANCIS, SCHETTINO and HANEMAN  3.